## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

| | |
|---|---|
| PROJECT TRAVEL, LLC, A Delaware Limited Liability Company, <br><br> Plaintiff, <br><br> v. <br><br> TERRA DOTTA, LLC, A North Carolina Limited Liability Company. <br><br> Defendant. | CIVIL ACTION <br><br> Case No. _____ <br><br><br> **JURY DEMAND** |

## COMPLAINT

Plaintiff Project Travel, LLC (d/b/a Via TRM) ("Project Travel" or "Plaintiff"), by and through its undersigned counsel, files this Complaint against Defendant Terra Dotta, LLC ("Terra Dotta" or "Defendant"). In support thereof, Project Travel states as follows:

## INTRODUCTION

1.      Project Travel's innovative products and services have upset Terra Dotta's position in the higher education software market. Unable or unwilling to compete on a level playing field, Terra Dotta has engaged in a pattern of misconduct against Project Travel to undermine Project Travel's business and to steal Project Travel's confidential and proprietary information.

2.      Specifically, between roughly April 2024 and October 2024, Terra Dotta held meetings with Jason Rowe ("Rowe"), who at the time was a Project Travel

employee. These meetings were conducted through International Office Consulting ("IOC"), a side business Rowe was working for while employed by Project Travel, albeit unbeknownst to Project Travel. Terra Dotta knew that Rowe was a Project Travel employee, and Rowe expressed to both Terra Dotta and IOC that the meetings were a potential conflict of interest, but they engaged in the meetings anyway.

3.    At around the same time Rowe and Terra Dotta began these meetings, Rowe began to transfer large amounts of extremely sensitive Project Travel files to his IOC email account and personal computer. He did this in a variety of ways, including changing permission settings within Project Travel's Google Drive account so the information could be accessed outside of Project Travel, "sharing" documents through Google Drive, and downloading Project Travel files to his personal computer. In fact, forensics show that Rowe, after changing these permissions, accessed Project Travel's Google Drive from multiple non-Project Travel devices. Rowe also deleted files from his Project Travel computer in an apparent effort to cover his tracks.

4.    Project Travel previously sued Rowe for this and other misconduct in a matter pending in this District titled *Project Travel, LLC v. Rowe,* Case No. 8:24-cv-02817-WFJ-LSG.

5.    Terra Dotta then offered Rowe a role as a General Manager, with direct responsibility over software that competes with the Project Travel software Rowe was directly working on at Project Travel. Despite Rowe's lack of qualifications, Rowe was offered this position without any substantive interview or even submitting a resume.

He received compensation well above his then-current compensation at Project Travel, a sizable bonus, and equity from Terra Dotta as compensation.

6.     Shortly after Rowe resigned from Project Travel and joined Terra Dotta, Terra Dotta announced a massive overhaul to their competing software. The changes are plainly intended to mirror the functions and features of Project Travel's software. Notably, prior to meeting with Rowe in April 2024, Terra Dotta complained to Rowe that it lacked the personnel to update its software. Yet, after Rowe joined Terra Dotta, Terra Dotta then moved up the timeline for the launch of this new software by several months. It is simply not feasible that Terra Dotta could have radically changed its software in such a short period of time without the use of Project Travel's confidential information or that it could have so closely mirrored Project Travel's own features without use of Project Travel confidential information, and, on information and belief, Rowe began communicating such information to Terra Dotta during meetings held while Rowe was still employed by Project Travel and which Rowe failed to disclose to Project Travel.

7.     Project Travel spent millions of dollars, over years, developing this software and proprietary information, and it is a cornerstone of Project Travel's business plan in the coming year. Project Travel has invested heavily in the planned public rollout of this software. If Project Travel's competitors, however, can simply copy this software, it would disrupt those plans, eliminate Project Travel's competitive advantage, damage Project Travel's relationship with its key stakeholders, and damage its reputation and goodwill in the marketplace.

8.    Terra Dotta's efforts to improperly compete against Project Travel are not limited to its actions with Rowe. Project Travel recently discovered that Terra Dotta was improperly trying to divert traffic from Project Travel's website, "viatrm.com" to the Terra Dotta website by "typosquatting" on the website "viatrn.com." The "viatrn.com" domain redirected internet users to Terra Dotta's own website, in a clear effort to confuse potential customers. Indeed, it was a confused potential customer that first brought this issue to Project Travel's attention. Based on internet records, Project Travel believes the "viatrn.com" domain was active for roughly three years before being taken down following a demand by Project Travel. Project Travel also demanded records of how many users had been redirected from the "viatrn.com" domain to Terra Dotta's website. Terra Dotta has not cooperated.

9.    Accordingly, Project Travel brings this action based upon: (1) violation of the Anticybersquatting Consumer Protection Act ("ACPA") (15 U.S.C. § 1125(d)); (2) trademark infringement; (3) false designation of origin (15 U.S.C § 1125(a)); (4) tortious interference with contract; (5) misappropriation of trade secrets under the Florida Uniform Trade Secrets Act (Fla. Stat. Ch. 688) ("FUTSA"); (6) misappropriation of trade secrets under the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) ("DTSA"); (7) aiding and abetting breach of fiduciary duty and the duty of loyalty; (8) tortious interference with prospective economic advantage; and (9) unfair competition in violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").

10.     Project Travel seeks the relief described herein to enforce its contractual rights, protect its confidential information (including trade secrets), remedy the harm caused by Terra Dotta's unfair competition, prevent Defendant from causing further irreparable harm to Project Travel, obtain injunctive relief, and to recover damages inflicted by Defendant on Project Travel's business and operations.

## THE PARTIES

11.     Plaintiff Project Travel is a leading provider of software and services related to international higher education. Project Travel offers a variety of services for American students seeking to study abroad and for international students seeking to study in the USA. Project Travel uses its proprietary software to help students find study programs, arrange for travel and lodging, navigate legal requirements such as visa programs, and enroll in study abroad programs. Project Travel offers comprehensive services for students and partners with universities and other service providers around the world to ensure its clients receive the best educational experience possible. Project Travel is incorporated in Delaware and has its headquarters and principal place of business in Venice, Florida. Via International is Project Travel's fastest-growing product line. A core feature of the VIA platform is the █████

████████████████████████████████████████████

████████████████

12.     Defendant Terra Dotta is a Limited Liability Company organized under the laws of North Carolina and with its principal place of business at 1330 Environ

Way, Chapel Hill, North Carolina. Terra Dotta competes with Project Travel in providing software and services related to international higher education.

13.    The actions and omissions alleged herein to have been undertaken by Rowe were actions and omissions that Terra Dotta authorized, controlled, directed, or had the ability to authorize, control, or direct, and/or were actions and omissions that Terra Dotta assisted, participated in, or otherwise encouraged. Terra Dotta aided and abetted the actions of Rowe set forth herein, had knowledge of those actions and omissions and their unlawful and/or improper nature, provided assistance, and benefited from those actions and omissions. At all relevant times, Rowe acted as the agent for Terra Dotta, and in doing the things herein alleged, was acting within the course and scope of such agency and with the permission and consent of Terra Dotta.

## JURISDICTION AND VENUE

14.    This Court has original jurisdiction over this action pursuant to the Defend Trade Secrets Act, 18 U.S.C. Section 1836(c) and the Lanham Act, and supplemental jurisdiction over Project Travel's state law claims pursuant to 28 U.S.C. Section 1367. In addition, there is a separate basis for jurisdiction in that complete diversity exists between Project Travel and Defendant and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332.

15.    Venue is proper in this District because the wrongful acts described in this Complaint occurred primarily in Florida and Project Travel's headquarters are located in this District.

16.     This Court has personal jurisdiction over Terra Dotta because it directed its actions to the state of Florida, the harm from Terra Dotta's misconduct was felt in Florida, and because Terra Dotta operates in and carries on business in Florida.

## FACTUAL ALLEGATIONS

**A.     Project Travel's Business**

17.     Plaintiff Project Travel is a leading provider of software and services for students seeking to study abroad. Project Travel uses its proprietary software to help students find study programs, arrange for travel and lodging, navigate legal requirements such as visa programs, and enroll in study abroad programs. Project Travel offers comprehensive services for students and partners with universities and other service providers around the world to ensure its clients receive the best educational experience possible.

18.     An integral part of Project Travel's business is dependent on developing and maintaining its proprietary software solutions, and in building and maintaining relationships with global partners.  Project Travel has expended considerable time, expense, and resources developing its software and network of partners throughout the United States and internationally.

**B.     Project Travel's Confidential and Trade Secret Information**

19.     Project Travel has invested years of time and millions of dollars developing its proprietary and confidential information, including trade secrets. Specifically, Project Travel has developed proprietary software called the ████████ ██████, which is an integral part of ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

20.    Project Travel's proprietary software provides a competitive advantage by offering ███████████████████████████████████████ ██████ By ensuring continuous operational capacity, the ███████████████ solves a critical problem faced by Project Travel and its competitors. In addition to this proprietary software, Project Travel has also created, at great time and expense, business strategies and roadmaps, pricing information, and customer and vendor information (including preferences and contact information, and curated compilations of such information), all of which are Project Travel trade secrets.

21.    These trade secrets are compiled and stored in password-protected databases and/or systems (including email systems) that are only accessible by Project Travel's employees.

22.    Additionally, certain Project Travel employees are provided access to a Project Travel Google Drive account.  Project Travel provides employees access to this Google Drive account so that they can store data belonging to Project Travel, including the proprietary information referenced above. This information is intended to be shared only internally, and the permissions required to access these files are generally limited to Project Travel employees. An employee accesses Project Travel's Google Drive through a Project Travel-owned Google account. Access to Project

Travel's Google Drive is limited to authorized Project Travel employees and requires a password to access.

23. Project Travel derives significant economic value and advantage from the confidential and trade secret nature of its information. Project Travel's confidential and proprietary information is critical to its ability to successfully compete in the marketplace, and provides Project Travel a competitive advantage over its competitors.

24. A competitor's or other third party's use of these trade secrets would result in irreparable harm to Project Travel. For example, it would allow a competitor to copy Project Travel's software and offer similar services that currently only Project Travel can provide and which Project Travel developed at tremendous cost and over a long period of time.

**C.**    **Project Travel's Efforts to Protect Its Confidential and Trade Secret Information**

25. Project Travel takes the protection of its information very seriously and expends a considerable amount of time and money to keep its information secure. At all relevant times, Project Travel has taken extensive and reasonable steps to protect the confidentiality of its trade secrets and other confidential information. This includes:

a. Locked premises that require authorization for employee/contractor access;

b.  Storing electronic documents on secure, password-protected databases and systems, with access restricted to authorized employees provided unique credentials by Project Travel;

c.  Requiring that a person accessing Project Travel's systems or devices, such as company-provided laptops, use a secure username/password;

d.  Further restricting access to documents stored on Project Travel's Google Drive account to authorized users through the use of permission restrictions. This includes role-based access permissions that restrict access to sensitive documents to those within Project Travel that have a business need to access the documents;

e.  Deploying mobile device management software on computer assets (laptops, desktops, and services) as well as mobile devices that have the ability to access Project Travel's Google Workspace platform, which ensure that the device has and maintains adequate security to access Project Travel's platforms and data;

f.  Use of data encryption to protect Project Travel data from outside access, and storage of Project Travel data in secure facilities; and

g.  An incident response plan that allows Project Travel to address suspected exfiltration of sensitive information.

26.    In addition, Project Travel requires its employees, including Rowe, to execute a confidentiality agreement as part of the onboarding process.  A true and

correct copy of the Proprietary Information and Inventions Assignment Agreement ("PIIA") that Rowe agreed to is attached hereto as **Exhibit 1** (the "Agreement").

    a. In **Section 1.1** of the Agreement, Rowe agreed, "I will hold in strictest confidence and will not disclose, use, lecture upon, or publish any of Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at Company and/or incorporates any Proprietary Information."

    b. **Section 4** of the Agreement, in order to prevent the misuse of Project Travel's confidential information, prohibits Rowe from engaging in competitive employment or other business activities while employed by Project Travel. *Id.* Similarly, in his Offer Letter, which Rowe executed on November 11, 2023, Rowe promised, "While [I] work for the Company, [I] will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company, unless approved by [Project Travel.] [I] also confirm to the Company that [I] have no contractual commitments or other legal obligations that would prohibit [me] from

performing [my] duties." A true and correct copy of Rowe's Offer Letter is attached as **Exhibit 2.**

c.  In **Section 6** of the PIIA**,** Rowe promised, "Upon termination of my employment or upon Company's request at any other time, I will deliver to Company all of Company's property, equipment, and documents, together with all copies thereof, and any other material containing or disclosing any Inventions, Third-Party Information or Proprietary Information of Company and certify in writing that I have fully complied with the foregoing obligation. I agree that I will not copy, delete, or alter any information contained upon my Company computer before I return it to Company. In addition, if I have used any personal computer, server, or email-system to receive, store, review, prepare, or transmit any Company information, including but not limited to Proprietary Information, I agree to provide the Company with a computer-useable copy of all such Proprietary Information and then permanently delete and expunge such Proprietary Information from those systems; and I agree to provide the Company access to my system as reasonably requested to verify that the necessary copying or deletion is completed." **Exhibit 1**.

d.  In **Section 8.6** of the PIIA, Rowe acknowledged "because my services are personal and unique and because I will have access to the Proprietary

Information of Company, any breach of this Agreement by me would cause irreparable injury to Company for which monetary damages would not be an adequate remedy and, therefore, will entitle Company to injunctive relief (including specific performance). The rights and remedies provided to each party in this Agreement are cumulative and in addition to any other rights and remedies available to such party at law or in equity." *Id.*

27.     In order to further project its confidential information, Project Travel provides employees with an Employee Handbook they are required to review and which contains additional policies regarding the use of confidential information and Project Travel's electronic systems. A true and correct copy of relevant sections of the Employee Handbook is attached as **Exhibit 3**.

    a. The Employee Handbook contains a section titled "Confidentiality" which prohibits employees from discussing internal business matters outside of Project Travel and which even restricts discussion of confidential materials within Project Travel to those on a "need-to-know" basis. *Id.* This section also provides, "All employees have a responsibility to avoid unnecessary disclosure of non-confidential internal information about the company, its employees, and its users" and "Employees who have authorized access to confidential information are responsible for its Security, according to the Via TRM IT & Security Policy. This policy seeks to protect Via TRM's confidential business

13

information. Employees found in violation of this policy are subject to disciplinary action, up to and including termination."

**D.    Rowe's Employment with Project Travel**

28.    Rowe joined Project Travel on or about January 1, 2024 as a Product Manager, Via International. As a Product Manager for Project Travel's Via International service, Rowe was responsible for overseeing the development and deployment of Project Travel's proprietary Via International software solutions,

████████████████████████████████████████████

████████████████████████

29.    On October 15, 2024, Rowe resigned from Project Travel. Initially, Rowe was allowed to continue working for Project Travel until his scheduled last day at the end of October. That same day, Rowe also received a Terra Dotta email account. At the time, Rowe had access to Project Travel's Google Drive account and the confidential documents stored on it. He also had confidential Project Travel documents on his personal computer, including working copies of Project Travel's ██ █████████ source code and executable files.

30.    However, on or about October 21st, Project Travel learned that Rowe planned to go to a competitor, Terra Dotta, and immediately ended his employment. Project Travel sent a termination notice to Rowe. In response, Rowe acknowledged that he was taking a position with Terra Dotta as a General Manager for Incoming Solutions.

31.    On October 23, 2024, Project Travel sent Rowe a follow-up email stating, in accordance with Rowe's PIIA, "We do need the immediate return of all company property that you are in possession of." Project Travel provided instructions for the return of physical property and of digital media.

32.    The next day, Rowe responded that he had sent his laptop back to Project Travel via FedEx. With regard to electronic files, Rowe responded that he had deleted them, except for what he referred to as personal files, after receiving his termination notice.

33.    Project Travel eventually received the laptop, but Rowe never directly provided Project Travel any electronic files.

34.    In an apparent effort to dissuade Project Travel from looking into his misconduct, Rowe stated in his email, "**I didn't take anything in any way shape or form nor had/have any interest or intention in doing so.**" (Emphasis added.)

35.    Not only was Rowe's response an admitted breach of his PIIA (which required him to **return, not delete,** electronic information), as set forth below, it is also not true. Rowe had taken extensive steps to steal Project Travel's information, continued to access that information after his separation from Project Travel, and proceeded to share that information with a third party.

36.    As set forth further below, Terra Dotta and Rowe were in close contact in October 2024. Rowe recently admitted that during this time he was meeting with Terra Dotta's attorneys regarding his PIIA, which he had provided a copy of to Terra Dotta's attorneys. Accordingly, both Rowe and Terra Dotta were well-aware of

Rowe's obligations under the PIIA, and Terra Dotta was apparently advising him regarding those duties.

E.    **Terra Dotta's Misconduct**

37.    Shortly after Rowe informed Project Travel of his resignation, Project Travel conducted a forensic examination of Rowe's Project Travel-issued computer and accounts. The investigation was initially conducted internally by Project Travel's information security team, and based on those preliminary results Project Travel retained a third-party computer forensics firm, iDiscovery Solutions ("iDS"), to perform a more thorough analysis. The results of that investigation show that Rowe engaged in systematic theft of some of Project Travel's most confidential and sensitive information.

38.    Specifically, iDS found:

a.    **Rowe changed permissions on Project Travel files stored on Google Drive and "Shared" Them**: An analysis of Rowe's Google Drive activity for Project Travel's Google Drive account shows that Rowe used his Project Travel issued Google Drive credentials to allow access to folders and files containing confidential and trade secret Project Travel information. As set forth above, one of the ways Project Travel protects its electronically-stored information is through the use of access permissions, which prevent anyone except for authorized users from accessing the files. Rowe, however, changed the permission settings for key files to circumvent this restriction.  Rowe used his Project Travel issued Google credentials to allow access to folders and files

16

with jason@iofficeconsulting.com. Rowe changed the permissions for specific files and folders, including:

i. June 14, 2024 – A Google document, titled "  ███████████████████████████████"

ii. August 16, 2024 – A Google folder, titled "████████████"

iii. August 16, 2024 – A Microsoft Word document, titled "██████████████████████████████████████████"

iv. August 28, 2024 a Google folder, titled "████"

v. August 28, 2024 a file, titled "████████"

Notably, Rowe altered permissions for folders titled "████████████████████████████████████ and for a file titled "█████████."

These files and folders contain highly confidential information about the ████ ████████████████████████████████████████████████.

Specifically, in addition to executable files, they contain system architecture diagrams, design files and prototypes, insights, testing protocols, data mapping templates, error-handling processes, and strategies.

Further, the same day he altered permissions for the ████████████ folder, he also altered permissions for and downloaded a file titled "████████ ██████████████████████████" Rowe had no legitimate, Project Travel business reason to change any of these settings. He also downloaded the "████████" file the same day he changed the permissions. The fact that Rowe changed the permissions **and** downloaded the files shows

his intent in changing the permissions was to share the information externally. After downloading them, he could access them on his Project Travel computer, but changing permissions further allowed the documents to be shared externally. The only reason for him to **also** change permissions for the files/folders is to allow them to be downloaded onto personal devices/accounts and/or shared outside of Project Travel.

b. **Rowe accessed confidential Project Travel files from personal devices**: On August 29, 2024, the day after changing permission settings for the " ███ folder and the ███████ " file, Rowe accessed Project Travel's Google Drive account from an unknown computer using one of his personal email accounts, allowing him to download those files and/or folders and store them outside of Project Travel's systems. This was not the only time Rowe accessed confidential Project Travel files from a personal device or account. He also accessed confidential Project Travel files on multiple occasions from an unknown computer and from two different iPhones between April 1, 2024 and September 4, 2024. None of those devices are Project Travel devices.

c. **Rowe "synced" folders on his Project Travel-issued computer to Google Drive, allowing him to access Project Travel information from personal devices/accounts**: A review of Rowe's Project Travel email and computer revealed that Rowe had been synchronizing his Downloads, Documents and Desktop folders from the Project Travel-issued computer to his

Project Travel Google Drive, which would have made them available to Rowe to download when he accessed Google Drive from unknown, personal devices. The Downloads, Documents and Desktop folders were "removed" (e.g., no longer synching from the Project Travel Macbook) on October 21, 2024 at 6:40 p.m. in an apparent effort by Rowe to cover his tracks.

       d.    **Rowe Deletes Project Travel files after accessing them, in an apparent attempt to cover up his misconduct**: On October 9, 2024, Rowe placed ███████████ into the trash folder. On October 18, 2024, Rowe deleted the following files from his Project Travel Google Drive account:

| |
|---|
| zoom background.png |
| ████████████ |
| ████████ |
| ██████████████████████ |
| Copy of Jason_Rowe_-_Worksite_Employee_Acknowledgment.pdf |
| Copy of Via TRM Mail - Passport.pdf |
| Copy of Justworks_Wrap_Plan_SPD.pdf |
| Copy of Via TRM Mail - Manual.pdf |
| Copy of Employee_Rights_and_Obligations_under_the_Massachusetts_Family_and_Medical_Leave_Law.pdf |
| Copy of Via TRM Employee Handbook_January_2022_JasonRowe (1).pdf |
| ████████ |

      39.    The circumstances of Rowe's hiring by Terra Dotta further confirm that Rowe used and/or intends to use the Project Travel information he stole to benefit himself and Terra Dotta.

      40.    Rowe began transferring information to his IOC email account at **the same time** he began meeting with Terra Dotta in or about April 2024. Those meetings,

which were not disclosed to Project Travel, were conducted through IOC. Rowe persisted in these meetings even after others at IOC warned him it presented a conflict of interest. Terra Dotta initially offered Rowe a job in or around June 2024. Then, as these meetings continued, Terra Dotta offered him a significantly greater role at Terra Dotta, and Terra Dotta made clear that it was Rowe's experience with software (i.e., the same software he was working on for Project Travel) that motivated the job offer. It is simply not plausible that Rowe and Terra Dotta were discussing anything **other** than how to improve Terra Dotta's competing software, even though both Rowe and Terra Dotta knew that Rowe was employed by Project Travel at the time. And Rowe was stealing massive amounts of Project Travel confidential information, including trade secrets, at the same time.

41.    When Rowe left Project Travel, he was making $125,000/year, which is in the market range for his position and experience.  However, as Rowe himself confirmed, his salary at Terra Dotta started at $█████ a year, nearly twice what he was making and well-above market for such a position. Further, Rowe was provided with a $█████ bonus by Terra Dotta. Such a payment is extremely unusual, and strongly suggests that Rowe is not being paid for his services, but rather for the Project Travel information and software he could bring to Terra Dotta. Rowe also recently confirmed that this job offer from Terra Dotta was made without Rowe submitting a resume or participating in any substantive interviews.

42.    According to Terra Dotta's own job description for Rowe's position, Rowe is woefully unqualified for the role of "General Manager" that he now holds for

Terra Dotta. The listed "qualifications" include "████████████████ ████████████████████████████████████████ ██████████████████████████████████████████." It also requires a "████████████████████████████████████████████ ███████████████████."

43.     While Rowe has spent many years in the higher education space, on information and belief, including testimony he provided in the related litigation with Project Travel, until joining Project Travel, Rowe never had product management experience and had not been in charge of a software product before. He has spent most of his career in a consulting role, and he only held his position with Project Travel for roughly ten months (and he was first offered a role with Terra Dotta after roughly five months). Curiously, Terra Dotta, which routinely releases press releases for new high-level employees, did not make a public announcement of its hiring of Rowe.

44.     Further, since Rowe's departure, Project Travel experienced multiple customers and potential customers that Rowe worked with at Project Travel backing out of commitments to use the Via International product solution and/or expressing concerns, that, on information and belief, suggest Rowe is, on behalf of Terra Dotta, aggressively soliciting these customers and potential customers to join Terra Dotta and using the promise of Project Travel's technology to try to convince them to leave. This is especially odd since Rowe is not a salesperson. Following these conversations, at least one of Project Travel's customers, who was one of the earliest adopters of the Via International product, reached out and raised questions about Project Travel's product

capabilities. The customer had not previously raised concerns about product capabilities. The customer also asked who would be replacing Rowe, which was odd since Project Travel had not told the customer that Rowe had left. Many of these customers specifically chose to work with Project Travel (in some cases leaving Terra Dotta to do so) because of its unique software capabilities, and the fact that they backed out of or expressed reservations strongly suggests that Rowe claimed to these customers that Terra Dotta has or will soon have the same capabilities. As set forth above, this is not plausible unless Rowe provided Project Travel's confidential information to Terra Dotta to allow them to copy Project Travel's capabilities because of the time and effort it would take to independently develop the product.   On information and belief, Rowe provided the Project Travel confidential information and trade secrets he stole from Project Travel to Terra Dotta during the secret meetings Rowe and Terra Dotta were hiding from Project Travel.

45.    Further, as of February 2025, Terra Dotta has begun advertising its "new" competing software, including at a recent industry convention. The new features and layout of the software are nearly identical to Project Travel's, including strikingly similar dashboard layouts and user interface, showing that Terra Dotta has indeed been copying Project Travel's software. That software had not publicly launched and is not available through lawful means to Terra Dotta, but Rowe transferred multiple working copies, along with toolkits, design documents, analysis, and strategies to his IOC email account and then had multiple meetings with Terra Dotta through IOC.

22

46.    The "new" features Terra Dotta advertises are essentially copies of Project Travel's own software, and most, if not all, were contained or discussed in the confidential documents Rowe stole, as follows:



███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

██████

      d.    Terra Dotta has also made several announcements for improvements in 2026, which are improvements Project Travel has already made, many of them in 2024 during Rowe's employment. This includes a ████████████████████████ which Project Travel is slated to release in 2025, and which Terra Dotta has announced for mid-2026, and ██████████████████ ████████████, which is an existing Project Travel capability that Terra Dotta has announced for mid-2026. Rowe was provided with confidential Project Travel Information on these features during his employment with Project Travel.

47.    In addition, Rowe failed to return any electronic files to Project Travel, despite his contractual obligation to do so. Terra Dotta was working with him and advising him on his obligations under the PIIA during this time. Rowe did not return any of the files he accessed from non-Project Travel devices or accounts.

48.    After Rowe joined Terra Dotta, Project Travel reached out to him and Terra Dotta about the above-identified misconduct and asked for Terra Dotta's cooperation in ensuring that Project Travel's information was not being used.

49.    Terra Dotta responded through counsel by falsely claiming that Rowe's employment with Terra Dotta had nothing to do with his prior work for Project Travel. That was not true. Rowe's role with Terra Dotta was almost identical in nature to his

role with Project Travel. He was working on Terra Dotta's software that competes with the Project Travel software he was previously working on.

50.    Terra Dotta also claimed that it was "confident" that Rowe was not using Project Travel's information, but Rowe recently confirmed that, at the time the letter was sent by Terra Dotta, Terra Dotta had not even asked him whether he was using such information.

51.    Further, Terra Dotta's offer letter to Rowe contains a promise to pay his legal fees if he is sued in relation to his prior employment, and even though that promise excludes claims for misappropriation, Rowe confirmed Terra Dotta is paying his legal bills in the related litigation between him and Project Travel. The offer letter also conditioned Rowe's employment on his execution of Terra Dotta's PIIA, but Rowe acknowledged he never signed one.

52.    **Terra Dotta Aids and Abets Rowe in Violating His Duty of Loyalty to Project Travel:** Separate from this misconduct involving Project Travel's electronic systems, Project Travel also recently learned that Rowe maintained separate employment from Project Travel in breach of his duty of loyalty to Project Travel, the terms of his Offer Letter, Section 4 of his PIIA, and Project Travel's conflict of interest policies.

53.    Specifically, Rowe represented that he had an "ownership interest" in IOC, but that he was only a "passive investor" and not involved in day-to-day work. Project Travel allowed Rowe to remain a passive investor in IOC, but never permitted him to actually engage in work for IOC. Despite this, Rowe continued to work for

25

IOC throughout his employment with Project Travel. As set forth above, this included working directly with Terra Dotta, Project Travel's direct competitor, between on or about April 2024 and the end of his employment with Project Travel. Terra Dotta facilitated and encouraged this competing employment, actively meeting with Rowe during that time despite the obvious conflict of interest. Had Project Travel known that Rowe was working for IOC or with Terra Dotta, it would have immediately terminated Rowe and cut off his access to Project Travel's confidential information.

54.    Further, roughly one week before Rowe's separation from Project Travel, Project Travel had a meeting with Stanford University, a key Project Travel partner. The customer stated they wanted Rowe present for the meeting, which was highly unusual as Rowe's role did not require him to attend such meetings, and he did not normally do so. Curious why the request was made, Project Travel searched online and found a profile on the Stanford University website listing Rowe as an employee. Notably, Stanford is a Terra Dotta customer.

55.    **Terra Dotta Cybersquats on Project Travel's "Viatrm.com" Domain:** In addition to the misconduct stated above, Project Travel also recently learned that Terra Dotta owned and operated the domain "viatrn.com." Project Travel learned of this when a confused user showed the "viatrn.com" domain to Project Travel. Notably, "n" and "m" are right next to each other on a standard keyboard, further showing the intent to confuse customers.

56.     The "viatrn.com" domain redirected, until it was recently taken down, users to Terra Dotta's website, and there is no notification to the user that they may have made a mistake or are being redirected.

57.     On information and belief, Terra Dotta owned the "viatrn.com" domain for approximately three (3) years.

58.     "Via TRM" is a common law mark owned by Project Travel that has been in use by Project Travel for nearly a decade. It is registered as a trade name in Colorado and Delaware. "Via TRM" is the trade name that Project Travel uses in the marketplace, and it is closely associated with Project Travel's services, such as the "█████████████████" and the "Via International" service line.

59.     Terra Dotta's actions were intentional, willful, and malicious.

60.     Terra Dotta is causing Project Travel irreparable harm and injury, including without limitation, the loss of clients, profits, business reputation, market share, the disclosure and misuse of trade secrets, confidential and/or proprietary business information, and loss of goodwill.

## COUNT I
## VIOLATION OF THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT
## 15 U.S.C. § 1125(d)

61.     Project Travel incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.15 U.S.C § 1125(d) provides, in relevant part,

A person shall be liable in a civil action by the owner of a mark, including a personal name which is protected as a mark under this section, if, without regard to the goods or services of the parties, that person—

    (i)    has a bad faith intent to profit from that mark, including a personal name which is protected as a mark under this section; and

    (ii)    registers, traffics in, or uses a domain name that

        (I)    in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;

        (II)    in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or

        (III)    is a trademark, word, or name protected by reason of section 706 of title 18 or section 220506 of title 36.

62.    The "Via TRM" is a common law mark owned by Project Travel and is registered as a trade name by Project Travel in multiple states. Project Travel is known by that name to its customers and derives an advantage and benefit in the marketplace from the use of this distinctive mark, which is closely associated by consumers with Project Travel.

63.    The "viatrn.com" domain, registered, owned, and used by Terra Dotta, is deceptive and confusingly similar to the "viatrm.com" domain owned and operated by Project Travel, and, on information and belief, is likely to and was intended to

28

confuse customers into believing the Terra Dotta website is affiliated with Project Travel. This is especially true because many customers that Terra Dotta and Project Travel compete over are not native English speakers and may not understand that Project Travel and Terra Dotta are separate companies.

64.    Terra Dotta had the bad faith intent to profit off of the Via TRM mark. Terra Dotta had no legitimate reason to use the "viatrn.com" domain, which is completely unrelated to Terra Dotta's own website, other than to confuse users and wrongfully usurp Project Travel's business.

65.    As a direct and proximate result of Terra Dotta's actions, Project Travel has suffered damages in an amount to be proven at trial, including through consumer confusion and damage to the Via TRM mark. Project Travel seeks its actual damages and/or statutory damages, and recovery of its reasonable attorney's fees and costs. Project Travel also seeks equitable relief, including injunctive relief.

## COUNT II
## TRADEMARK INFRINGEMENT
### Florida Common Law

66.    Project Travel incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

67.    The "Via TRM" is a common law mark owned by Project Travel and is registered as a trade name by Project Travel in multiple states. Project Travel is known by that name to its customers and derives an advantage and benefit in the marketplace from the use of this distinctive mark, which is closely associated by consumers with Project Travel.

68.     The "viatrn.com" domain, owned and operated by Terra Dotta, is deceptively similar to the "viatrm.com" domain owned and operated by Project Travel, and, on information and belief, is likely to and was intended to confuse customers into believing the Terra Dotta website is affiliated with Project Travel. This is especially true because many customers that Terra Dotta and Project Travel compete over are not native English speakers and may not understand that Project Travel and Terra Dotta are separate companies.

69.     On information and belief, the "viatrn.com" domain has caused consumer confusion with the "Via TRM" mark, damage to the "Via TRM" mark, and has caused damage to Project Travel's reputation, customer relationships, and goodwill.

70.     As a direct and proximate result of Terra Dotta's actions, Project Travel has suffered damages in an amount to be proven at trial, including through consumer confusion and damage to the Via TRM mark. Project Travel seeks its actual damages, and recovery of its reasonable attorney's fees and costs. Project Travel also seeks equitable relief, including injunctive relief.

## COUNT III
## FALSE DESIGNATION OF ORIGIN
## 15 U.S.C. § 1125(a)

71.     Project Travel incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

72.     The "Via TRM" is a common law mark owned by Project Travel and is registered as a trade name by Project Travel in multiple states. Project Travel is known

by that name to its customers and derives an advantage and benefit in the marketplace from the use of this distinctive mark, which is closely associated by consumers with Project Travel.

73.    The "viatrn.com" domain, owned and operated by Terra Dotta, is deceptively similar to the "viatrm.com" domain owned and operated by Project Travel, and, on information and belief, is likely to and was intended to confuse customers into believing the Terra Dotta website is affiliated with Project Travel.

74.    On information and belief, the "viatrn.com" domain has caused consumer confusion with the "Via TRM" mark, damage to the "Via TRM" mark, and has caused damage to Project Travel's reputation, customer relationships, and goodwill.

75.    Further, on information and belief, the use of the "viatrn.com" domain was intended to falsely portray Terra Dotta as affiliated with Project Travel.

76.    As a direct and proximate result of Terra Dotta's actions, Project Travel has suffered damages in an amount to be proven at trial, including through consumer confusion and damage to the Via TRM mark. Project Travel seeks its actual damages and/or statutory damages, and recovery of its reasonable attorney's fees and costs. Project Travel also seeks equitable relief, including injunctive relief.

## COUNT IV
## TORTIOUS INTERFERENCE WITH CONTRACT

77.    Project Travel incorporates by reference the allegations of the preceding paragraphs as though set forth fully herein.

78.    The PIIA and Offer Letter are enforceable contracts between Rowe and Project Travel.

79.    Project Travel has satisfied all of its obligations under the terms and conditions of the above-referenced agreements that it was required to perform, and Rowe's performance of his obligations under these agreements was not excused.

80.    Rowe breached the agreements by taking, failing to return, using and disclosing Project Travel's confidential information, including as set forth above.

81.    Terra Dotta substantially contributed to Rowe's breaches of contract through the above-described misconduct, including by facilitating and assisting Rowe in disclosing and using Project Travel's confidential information, assisting Rowe in engaging in competitive activities and conflicts of interest while Rowe was employed by Project Travel, and assisting Rowe in deleting, rather than returning, Project Travel information.

82.    Terra Dotta was aware of Rowe's obligations to Project Travel, including because Rowe provided a copy of the Project Travel PIIA to Terra Dotta, informed them of his role with Project Travel, and discussed the potential for a conflict with them (even though he failed to disclose to Project Travel that he was working with Terra Dotta). Terra Dotta could not have reasonably believed that Rowe was permitted to directly assist Project Travel's direct competitor while he was employed by Project Travel. Project Travel has legal rights under the Agreements.

83.    Despite having knowledge of Project Travel's legal rights under the agreements, Terra Dotta intentionally and unjustifiably interfered with Project

Travel's contractual relationship by inducing and facilitating Rowe's breaches of the agreements.

84.    As a direct and proximate result of Terra Dotta's intentional and unjustified interference with Project Travel's contractual relationship with Rowe, Project Travel has suffered and will continue to suffer damages.

85.    Terra Dotta has benefitted and will continue to directly benefit from Rowe's violations of the agreements.

86.    Terra Dotta was and is aware of Rowe's breaches, and ratified and condoned the same.

87.    As a direct and proximate result of Terra Dotta's misconduct, Project Travel has suffered damage, in an amount to be proven at trial.

**COUNT V**
**MISAPPROPRIATION OF CONFIDENTIAL**
**INFORMATION AND TRADE SECRETS – VIOLATION OF THE FLORIDA**
**UNIFORM TRADE SECRETS ACT**

88.    Project Travel incorporates herein by reference the allegations of the preceding paragraphs.

89.    Terra Dotta, through Rowe, obtained access to Project Travel's trade secret information, including its ██████████ source code and executable packages, data-mapping templates, workflow diagrams, integration protocols, and other supporting documents.

90.    Project Travel has taken reasonable steps to maintain the confidential nature of this information, including through the use of confidentiality agreements and

electronic security measures.  This information is not available to the public and would be valuable to a competitor.  Further, Project Travel's trade secrets derive economic value from not being readily ascertainable by others in the industry.

91.    Terra Dotta misappropriated Project Travel's trade secrets through the wrongful conduct identified above, including by wrongfully acquiring, through Rowe, Project Travel's trade secrets related to Project Travel's ███████████. Rowe began stealing that information at the same time he began secretly meeting with Terra Dotta, and Terra Dotta subsequently offered Rowe an incredible sum of money to take a job for Terra Dotta that Rowe was not qualified for. Both Terra Dotta and Rowe then made false statements about Rowe's work for Terra Dotta, and Rowe struggled to explain what work he has actually done for Terra Dotta since starting work there.

92.    On information and belief, Terra Dotta has misappropriated, disclosed, and used, and will continue to misappropriate, disclose, and use for its benefit and to Project Travel's detriment, Project Travel's trade secret information unless it is enjoined from doing so.

93.    Terra Dotta's misappropriation of Project Travel's trade secret information has caused and will continue to cause Project substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets. Terra Dotta has also been unjustly enriched by his misappropriation of Project Travel's trade secrets.

94.    Terra Dotta's misappropriation of Project Travel's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. Rowe

misappropriated Project Travel's trade secrets intentionally and knowingly and with a deliberate intent to benefit himself and injure Project Travel. Accordingly, Project Travel is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of punitive damages and attorney's fees.

**COUNT VI**
**MISAPPROPRIATION OF CONFIDENTIAL**
**INFORMATION AND TRADE SECRETS – VIOLATION OF THE DEFEND**
**TRADE SECRETS ACT- 18 U.S.C. § 1836**

95.    Project Travel incorporates herein by reference the allegations of the preceding paragraphs.

96.    Terra Dotta, through Rowe, obtained access to Project Travel's trade secret information, including its ███████████ source code and executable packages, data-mapping templates, workflow diagrams, integration protocols, and other supporting documents.

97.    Project Travel has taken reasonable steps to maintain the confidential nature of this information, including through the use of confidentiality agreements and electronic security measures. This information is not available to the public and would be valuable to a competitor. Further, Rowe's trade secrets derive economic value from not being readily ascertainable by others in the industry.

98.    Terra Dotta misappropriated Project Travel's trade secrets through the wrongful conduct identified above, including by wrongfully acquiring, through Rowe, Project Travel's trade secrets related to Project Travel's ███████████ Rowe began stealing that information at the same time he began secretly meeting with Terra

Dotta, and Terra Dotta subsequently offered Rowe an incredible sum of money to take a job for Terra Dotta that Rowe was not qualified for. Both Terra Dotta and Rowe then made false statements about Rowe's work for Terra Dotta, and Rowe struggled to explain what work he has actually done for Terra Dotta since starting work there.

99.    On information and belief, Terra Dotta has misappropriated, disclosed, and used, and will continue to misappropriate, disclose, and use for its benefit and to Project Travel's detriment, Project Travel's trade secret information unless it is enjoined from doing so.

100.    Terra Dotta's misappropriation of Project Travel's trade secret information has caused and will continue to cause Project Travel substantial injury, including but not limited to actual damages, lost profits, harm to its reputation, and the diminution in value of its trade secrets. Terra Dotta has also been unjustly enriched by his misappropriation of Project Travel's trade secrets.

101.    Terra Dotta's misappropriation of Project Travel's trade secrets was intentional, knowing, willful, malicious, fraudulent, and oppressive. Rowe misappropriated Project Travel's trade secrets intentionally and knowingly and with a deliberate intent to benefit himself and injure Project Travel.  Accordingly, Project Travel is entitled to damages, in an amount to be determined at trial, as well as injunctive relief, and an award of punitive damages and attorney's fees.

## COUNT VII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY & DUTY OF LOYALTY

67.     Project Travel realleges and incorporates by reference each allegation set forth in the preceding paragraphs.

68.     As an employee of Project Travel, Rowe owed Project Travel fiduciary duties, including a duty of loyalty.  As a result, he was obligated to act with the utmost good faith and in the best interest of Project Travel.

69.     Project Travel was entitled to place its trust and confidence in Rowe and was entitled to expect Rowe to act with the utmost good faith toward it in carrying out the business of Project Travel.

70.     Project Travel relied on Rowe's loyalty and integrity and faithful performance of his job duties and responsibilities.

71.     Through the actions set forth above, including his work for other entities while employed by Project Travel, Defendant Rowe knowingly and willingly breached his fiduciary duties to Project Travel.

72.     This claim is not predicated on the misappropriation or theft of any confidential, proprietary and/or trade secret information belonging to Project Travel.  Rather, it is predicated on Rowe's deceit and breach of his duties of loyalty.

73.     Terra Dotta was aware that Rowe was employed by Project Travel and owed duties to Project Travel.

74.     Terra Dotta aided and facilitated Rowe's misconduct, including by working with Rowe to improve Terra Dotta's software, which competed with Project Travel's software, while Rowe was employed by Project Travel.

75.     As a direct and proximate result of Rowe's breach of his duties, and Terra Dotta's misconduct, Project Travel has been and is being harmed and faces irreparable injury.

76.     Project Travel is entitled to damages, in an amount to be determined at trial, as well as disgorgement by Terra Dotta of all profits Terra Dotta received as a result of its misconduct, in an amount to be determined at trial. Project Travel is further entitled to injunctive relief against Terra Dotta to remedy its past improper conduct and prevent further irreparable harm to Project Travel.

77.     Terra Dotta's actions were done with malice, fraud, oppression, and reckless disregard of the above-described rights of Project Travel.  Therefore, Project Travel seeks and is entitled to recover punitive damages from Terra Dotta.

## COUNT VIII
### TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

78.     Project Travel realleges and incorporates by reference each allegation set forth in the preceding paragraphs.

79.     Project Travel had valid and prospective business relationships with customers.

80.     Terra Dotta has intentionally and improperly interfered, or is attempting to interfere, with these business relationships and expectancy of future business

relationships by stealing and utilizing Project Travel's confidential and proprietary information, including knowledge of Project Travel's software, to solicit these Project Travel connections and usurp these Project Travel opportunities.

81.    Terra Dotta's conduct was undertaken with malice, or in knowing disregard of or indifference to, the rights and interests of Project Travel.

82.    As a direct and proximate result of Terra Dotta's interference, Project Travel has suffered and will continue to suffer actual damages, including lost profits and other economic damages.

## COUNT IX
## UNFAIR COMPETITION IN VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("FDUTPA")

83.    Terra Dotta is engaged in "trade or commerce" within the meaning of those terms as used in Fla. Stat. § 501.204.

84.    The above wrongful conduct by Terra Dotta constitutes unfair and deceptive acts and practices in the conduct of trade or commerce and, therefore, violates Fla. Stat. § 501.204.

85.    Terra Dotta acted willfully because Terra Dotta knew or should have known that its conduct violated Fla. Stat. § 501.204. Terra Dotta conducts business in Florida and knows Project Travel is based in Florida.

86.    These unfair and deceptive acts and practices hurt the public interest because, among other reasons, they are capable of repetition.

87.    Project Travel has suffered actual damages under Fla. Stat. § 501.211(2) as a direct and proximate result of these unfair and deceptive acts and practices.

88.    Terra Dotta should be enjoined to stop past, current or future violations of the FDUTPA pursuant to Fla. Stat. § 501.211(1).

89.    Project Travel is also entitled to recover its attorney's fees incurred in the prosecution of this action, pursuant to Fla. Stat. § 501.2105.

## PRAYER FOR RELIEF

WHEREFORE, Project Travel respectfully requests this Court enter an Order:

a.    Enjoining Defendant from disclosing any of Project Travel's trade secret, confidential, and/or proprietary business information, or using such information to benefit themselves or any third party;

b.    Directing Defendant to return all Project Travel information, documents, data, files, and materials, including electronically stored information, in its possession, custody, and/or control;

c.    Directing Defendant to participate in a forensic remediation process, conducted by a Court-appointed forensic neutral and at Defendant's expense, to insure that all of Project Travel's information is returned to Project Travel and securely removed from Defendant's possession, custody, or control;

d.    Prohibiting Terra Dotta from working with any Project Travel customers or prospective customers that Rowe previously worked with, received confidential information about, or took confidential about;

e.    Prohibiting Terra Dotta from owning, registering, or using the "Viatrn.com" domain or any other domain that is confusingly similar to the "Via TRM" mark.

f.    Awarding damages for Defendant's wrongful conduct, according to proof at trial;

g.    Awarding Project Travel its reasonable attorneys' fees, costs, and expenses, as well as pre-and post-judgment interest;

       h.     Awarding punitive/exemplary damages against Defendant; and

       i.     Granting such other and further relief as the Court may deem just, equitable, and proper.

Dated:  October 30, 2025           LITTLER MENDELSON P.C.

                             */s/ Tyler A. Sims*
                             Tyler A. Sims, Esq.
                             Florida Bar No. 1048908
                             tsims@littler.com
Derek Hecht, Esq. (motion for special     West A. Holden, Esq.
admission to be submitted)           Florida Bar No. 0113569
dhecht@littler.com                  wholden@littler.com
Littler Mendelson, P.C.           111 North Orange Avenue, Suite 1750
18565 Jamboree Rd, Suite 800     Orlando, FL 32801.2366
Irvine CA 92612                  Tel:   407.393.2900
Tel: 949.705.3000              Fax:   407.393.2929
Fax: 949.724.1201

                  Attorneys for Plaintiff